---

FROM: [redacted]
TO: 20953041
SUBJECT: [redacted]
DATE: [redacted]

[redacted]

RECEIVED BY MAIL
SEP 08 2026
CLERK, U.S. DISTRICT COURT
MINNEAPOLIS, MINNESOTA

SCANNED
SEP 08 2026
U.S. DISTRICT COURT MPLS

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MINNESOTA

PAUL R. HANSMEIER,
Petitioner,

v. Case No.. _______________

WARDEN, FEDERAL PRISON CAMP
DULUTH,
Respondent.

PETITION FOR A WRIT OF HABEAS CORPUS UNDER 28 U.S.C. SEC. 2241
(Miscalculation of First Step Act Conditional Placement Days)

Petitioner Paul R. Hansmeier, a federal prisoner confined at the Federal Prison Camp in Duluth, Minnesota, petitions this Court for a writ of habeas corpus under 28 U.S.C. Sec. 2241 and states as follows.

REQUEST FOR EXPEDITED TREATMENT UNDER 28 U.S.C. SEC. 2243

Mr. Hansmeier respectfully requests expedited treatment of this Petition. Section 2243 directs that a court entertaining an application for the writ "shall forthwith award the writ or issue an order directing the respondent to show cause why the writ should not be granted," and that the return be made within three days unless extended for good cause "not exceeding twenty days." 28 U.S.C. Sec. 2243. Expedition is not merely authorized here; it is essential to the availability of any relief at all. Under the Bureau of Prisons' own current projections, Mr. Hansmeier will be transferred to prerelease custody in January 2027 notwithstanding the unlawful calculation challenged in this Petition, and the Eighth Circuit has held that such a transfer moots a First Step Act credit claim. Fortner v. Eischen, 170 F.4th 655, 658 (8th Cir. 2026). Every month of delay therefore both prolongs Mr. Hansmeier's unlawful institutional confinement and carries this case closer to mootness. Mr. Hansmeier asks the Court to order Respondent to show cause forthwith and to set an expedited schedule for briefing and decision.

I. INTRODUCTION

This case is about arithmetic, and about whether the Bureau of Prisons may change the rules of that arithmetic in the middle of a sentence. The First Step Act of 2018 provides that an eligible prisoner who successfully completes recidivism-reduction programming "shall earn time credits," 18 U.S.C. Sec. 3632(d)(4)(A); that those credits "shall be applied toward time in prerelease custody or supervised release," id. Sec. 3632(d)(4)(C); and that the Director of the Bureau of Prisons "shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release," id. A prisoner is eligible for that transfer when, among other things, he "has earned time credits .. . . in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment." 18 U.S.C. Sec. 3624(g)(1)(A).

To give effect to those commands, the Bureau does not wait until a prisoner's earned-to-date credits happen to equal his remaining sentence. It projects. Its own Program Statement directs staff to "assume that the inmate will remain in earning status" and to count "assumed FTC days that the inmate will earn" in fixing the prisoner's FSA Conditional Placement Date. The Bureau's May 2025 directive on home confinement likewise instructs unit teams to use "FSA and SCA Conditional Placement Dates--based on projected Earned Time Credits (FTCs) expected to earn." The Bureau accepts, in other words, that the date on which a prisoner "has earned" credits equal to the remainder of his sentence is a forward-looking calculation that necessarily counts credits not yet in hand.

The only question in this case is where that projection stops. Through September 2024, the Bureau projected Mr. Hansmeier's credits through the end of his term of imprisonment, consistent with its published position, announced in November 2022 and repeated to prisoners, to Congress, and to the courts, that "inmates will be able to continue earning credit while in the community, so long as they continue to successfully comply with all the rules and procedures of pre-release custody." Under

that methodology Mr. Hansmeier would accrue 1,585 FSA Conditional Placement Days, and his Conditional Placement Date was February 6, 2026. Then the Bureau, without rulemaking, without explanation, and without acknowledging any change, halted the projection at the moment of transfer; the first document in Mr. Hansmeier's possession reflecting the change is a revised Assessment issued in December 2024. The Bureau now counts the credits Mr. Hansmeier will earn until he walks out of the Federal Prison Camp in Duluth, but refuses to count the credits he will earn, under the same statute and the same regulation, while serving the remainder of his sentence in a residential reentry center or on home confinement. That single change cut his Conditional Placement Days to 1,074 and pushed his Conditional Placement Date to July 18, 2027. Nothing about Mr. Hansmeier changed. Only the Bureau's arithmetic did.

The Bureau's revised methodology cannot be reconciled with the text of the Act, which excludes exactly two periods from credit-earning and prerelease custody is not one of them; with the Bureau's own notice-and-comment regulation, which deliberately deleted a proposed prohibition on earning credits in prerelease custody; with the Bureau's years of consistent, official construction of that regulation; with the Administrative Procedure Act's requirement that an agency at least acknowledge and explain a change of course; or with the Ex Post Facto and Due Process Clauses, which forbid the government from retroactively lengthening the period a prisoner must spend in secure custody by rewriting the formula that governs his release. February 6, 2026 has come and gone. Mr. Hansmeier remains in institutional custody. The writ should issue.

II. PARTIES, JURISDICTION, AND VENUE

Petitioner Paul R. Hansmeier, Register Number 20953-041, is a federal prisoner in the custody of the Bureau of Prisons, confined at the Federal Prison Camp in Duluth, Minnesota (FPC Duluth), in St. Louis County, Minnesota, within this District. Respondent is the Warden of FPC Duluth, Mr. Hansmeier's immediate custodian, sued in his or her official capacity. Because a Sec. 2241 petition must name the immediate custodian and be filed in the district of confinement, Rumsfeld v. Padilla, 542 U.S. 426, 435, 443 (2004), this Court has personal jurisdiction over Respondent and venue is proper.

This Court has subject-matter jurisdiction under 28 U.S.C. Sec. 2241(c)(3), which extends the writ to a prisoner "in custody in violation of the Constitution or laws or treaties of the United States." A federal prisoner's challenge to the Bureau's computation of sentence credits is a challenge to the execution of his sentence and lies in habeas. Matheny v. Morrison, 307 F.3d 709, 711-12 (8th Cir. 2002). The Supreme Court itself resolved a dispute over the Bureau's method of computing sentence credit on a petition under Sec. 2241, Barber v. Thomas, 560 U.S. 474 (2010), and the Eighth Circuit has repeatedly adjudicated, in habeas, the lawfulness of Bureau rules governing when a prisoner may be moved from an institution to community confinement, Elwood v. Jeter, 386 F.3d 842, 846-47 (8th Cir. 2004); Fults v. Sanders, 442 F.3d 1088, 1090-92 (8th Cir. 2006).

Mr. Hansmeier does not challenge the conditions of his confinement, and he does not ask this Court to second-guess any individualized designation of a place of imprisonment. He challenges a number: the Bureau's calculation of how many First Step Act time credits he has earned and will earn, and therefore the date on which, by statute, he became an "eligible prisoner" under Sec. 3624(g)(1)(A). That number determines the duration of his confinement inside a Bureau institution. A claim that, if successful, results in earlier release from institutional confinement lies at the core of the writ. Preiser v. Rodriguez, 411 U.S. 475, 484, 500 (1973). Recent developments confirm the point. In Maxwell v. Thomas, 133 F.4th 453 (5th Cir. 2025) (per curiam), cert. granted, No. 25-5930 (U.S. June 1, 2026), the Supreme Court has agreed to decide "[w]hether a claim regarding application of time credits under the First Step Act of 2018 . . . seeking accelerated transfer to a halfway house or home confinement, can be brought in a habeas petition under 28 U.S.C. Sec. 2241." The Solicitor General declined to defend the Fifth Circuit's rule that such claims are not cognizable, and the Court appointed an amicus to do so. The government's own position, in other words, is now that claims like this one belong in habeas. The Eighth Circuit's jurisdictional precedents, and the government's likely reliance on them, are addressed in Part VII below.

III. EXHAUSTION

Exhaustion of the Bureau's administrative remedy program is not a jurisdictional prerequisite to a Sec. 2241 petition; it is a judicially created requirement that "can be disregarded where appropriate." Lueth v. Beach, 498 F.3d 795, 797 n.3 (8th Cir. 2007); see Mathena v. United States, 577 F.3d 943, 946 (8th Cir. 2009). Prior to filing this Petition, Mr. Hansmeier filed an administrative remedy request with the Bureau's Central Office on Form BP-11, requesting correction of his First Step Act calculation. Mr. Hansmeier filed directly with the Central Office pursuant to 28 C.F.R. Sec. 542.14(d)(5), which authorizes administrative remedy requests with respect to decisions that did not originate with the Warden to be filed with the Bureau office that made the decision; the calculation methodology challenged here is a decision of the Bureau's central office, not of any Warden. To the extent any further or different administrative step could be said to remain, exhaustion should be excused. The methodology Mr. Hansmeier challenges is not a decision of the Warden or the Regional Director; it is a national computational rule imposed by the Bureau's central office through its national "First Step Act (FSA) Planning Dates" directive. No institution or regional official has authority to depart from it, so administrative review at those levels offers no genuine opportunity for relief

and would be futile. See Elwood, 386 F.3d at 844 n.1. And every day of delay inflicts a deprivation that cannot later be restored: a day spent in secure custody that the statute required to be spent in the community is gone forever. Cf. Fortner, 170 F.4th at 658 (dismissing First Step Act credit appeal as moot after the prisoner was transferred to a halfway house while the case was pending). Requiring further exhaustion would serve no purpose but delay, and delay here is the injury.

IV. THE STATUTORY AND REGULATORY FRAMEWORK

A. The First Step Act.

Section 101 of the First Step Act of 2018, Pub. L. No. 115-391, 132 Stat. 5194, 5198, created the federal time-credit system codified at 18 U..S.C. Sec. 3632(d)(4). The earning provision is mandatory and unconditioned on location: "A prisoner, except for an ineligible prisoner under subparagraph (D), who successfully completes evidence-based recidivism reduction programming or productive activities, shall earn time credits" at the rate of "10 days of time credits for every 30 days of successful participation," rising to 15 days per 30 for a prisoner "determined by the Bureau of Prisons to be at a minimum or low risk for recidivating, who, over 2 consecutive assessments, has not increased their risk of recidivism." 18 U.S.C. Sec. 3632(d)(4)(A)(i)-(ii).

[redacted]

TRULINCS 20953041 - HANSMEIER, PAUL R - Unit: DTH-E-A

---

FROM: [redacted]
TO: 20953041
SUBJECT: [redacted]
DATE: [redacted]

[redacted]

Congress identified precisely two periods during which a prisoner "may not earn time credits": for programming completed "prior to the date of enactment of this subchapter," and "during official detention prior to the date that the prisoner's sentence commences under section 3585(a)." 18 U.S.C. Sec. 3632(d)(4)(B). It identified categories of prisoners who are "ineligible to receive time credits" because of their offenses of conviction, id. Sec. 3632(d)(4)(D), and it barred prisoners subject to final orders of removal from applying credits, id. Sec. 3632(d)(4)(E). Nowhere did Congress exclude time spent in prerelease custody. To the contrary, the Act defines "prisoner" as "a person who has been sentenced to a term of imprisonment pursuant to a conviction for a Federal criminal offense, or a person in the custody of the Bureau of Prisons," 18 U.S.C. Sec. 3635(4), and a person in a residential reentry center or on home confinement remains a person in the custody of the Bureau of Prisons.

The application provision is equally mandatory: "Time credits earned under this paragraph by prisoners who successfully participate in recidivism reduction programs or productive activities shall be applied toward time in prerelease custody or supervised release. The Director of the Bureau of Prisons shall transfer eligible prisoners, as determined under section 3624(g), into prerelease custody or supervised release." 18 U.S.C. Sec. 3632(d)(4)(C).

Section 3624(g) then defines the "eligible prisoner." The relevant criterion is that the prisoner "has earned time credits under the risk and needs assessment system developed under subchapter D . . . in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment." 18 U.S.C. Sec. 3624(g)(1)(A). The prisoner must also have "shown through the periodic risk reassessments a demonstrated recidivism risk reduction or ha[ve] maintained a minimum or low recidivism risk," id. Sec. 3624(g)(1)(B); must have "had the remainder of the prisoner's imposed term of imprisonment computed under applicable law," id. Sec. 3624(g)(1)(C); and, for placement in prerelease custody, must have "been determined under the System to be a minimum or low risk to recidivate pursuant to the last 2 reassessments," id. Sec. 3624(g)(1)(D)(i)(I). "Prerelease custody" means home confinement or placement in a residential reentry center, id. Sec. 3624(g)(2)(A)-(B), and Congress removed the ordinary durational ceilings on community placement for prisoners transferred under this provision: "The time limits under subsections (b) and (c) shall not apply to prerelease custody under this subsection." Id. Sec. 3624(g)(10). Separately, the Bureau "may transfer the prisoner to begin any such term of supervised release at an earlier date, not to exceed 12 months, based on the application of time credits under section 3632." Id. Sec. 3624(g)(3). Congress also commanded that the Director "shall ensure there is sufficient prerelease custody capacity to accommodate all eligible prisoners." Id. Sec. 3624(g)(11).

The forfeiture provision completes the picture, and it is central to this case. When Congress wanted to freeze a credit calculation at a particular historical moment, it said so in unmistakable terms. The Bureau's disciplinary guidelines must provide "that any reduction that includes the loss of time credits shall require written notice to the prisoner, shall be limited to time credits that a prisoner earned as of the date of the prisoner's rule violation, and shall not include any future time credits that the prisoner may earn." 18 U.S.C. Sec. 3632(e)(2). Congress thus wrote, in the same statute, both a backward-looking snapshot ("earned as of the date") that expressly excludes "future time credits," and a forward-looking eligibility test ("has earned . . . in an amount that is equal to the remainder") that contains no such limitation.

B. The Bureau's notice-and-comment rule.

The Bureau's proposed rule, published November 25, 2020, would have provided that "FSA Time Credits can only be earned while an inmate is in a Bureau facility, and will not be earned if an inmate is in a Residential Reentry Center or on home confinement." 85 Fed. Reg. 75268 (Nov. 25, 2020). That proposal drew formal opposition from the Act's principal sponsors. Senators Whitehouse and Cornyn objected that the restriction cited no authority and "is not consistent with the goals of the First Step Act," and Representative Jeffries wrote that he saw "no reason to make individuals in Residential Reentry Centers (RRCs) or in home confinement ineligible to earn time credits," because "Congress could have used a narrower definition or explicitly excluded certain categories of individuals based on where they serve their sentence, but it chose not to do so." FSA Time Credits, 87 Fed. Reg. 2705, 2712 (Jan. 19, 2022).

The Bureau agreed. Its published response was unequivocal: "After carefully considering the comments received, the Bureau agrees that inmates in prerelease custody--whether in a residential reentry center (RRC) or on home confinement--are eligible to earn FSA Time Credits under 18 U.S.C. 3632(d)(4)(A), which they could presumably apply, under 18 U.S.C. 3632(d)(4)(C), toward transfer to supervised release." 87 Fed. Reg. at 2712-13. The Bureau added that it "will work on a case-by-case basis with eligible inmates in RRCs to identify appropriate programming for them to earn FSA Time Credits." Id. The proposed

prohibition was deleted, and nothing in the final rule as codified at 28 C.F.R. Part 523, Subpart E, bars the earning of credits in prerelease custody. The rule provides instead that "an eligible inmate begins earning FSA Time Credits after the inmate's term of imprisonment commences," 28 C.F.R. Sec. 523.42(a), and identifies a closed list of statuses that interrupt "successful participation"--special housing, temporary "designation status outside the institution (e.g., for extended medical placement in a hospital or outside institution, an escorted trip, a furlough, etc.)," transfer to another agency's custody, mental-health holds, and opting out, id. Sec. 523.41(c)(4)--none of which describes service of a sentence in prerelease custody.

C. The Bureau's consistent implementation of the rule.

The Bureau then told everyone what the rule meant. On November 18, 2022, announcing Program Statement 5410.01, the Bureau published a news release describing "three major changes" in how credits are calculated: "First, inmates will soon be able to see all potential Federal Time Credits (FTC) they may earn over the course of their sentence at their first Unit Team meeting. . . . Second, inmates will be able to earn credit while in administrative detention . . . . Finally, inmates will be able to continue earning credit while in the community, so long as they continue to successfully comply with all the rules and procedures of pre-release custody." Bureau of Prisons, First Step Act Time Credits Policy Released (Nov. 18, 2022).. (Pet. Ex. C.)

Program Statement 5410.01 institutionalized that construction. It directs that "[f]or inmates in pre-release placement, reassessments will be completed automatically on a monthly basis and will capture changes which occur during prerelease placement"; it instructs staff to "assume that the inmate will remain in earning status from the referral date until the transfer to prerelease custody"; and it computes the Conditional Placement Date by adding "assumed FTC days that the inmate will earn until the FSA conditional release date." Program Statement 5410.01, CN-2. The Attorney General reported to Congress in April 2023 that the new rule and Program Statement clarified that "time credit could continue to be earned in community placement (i.e., home confinement or [halfway house])," that the Bureau "will calculate and award time credits for the full incarceration term," and that credits "are now calculated at the initial stages of the individual's sentence, with a presumption that the time credits will accrue throughout the term of incarceration." U.S. Department of Justice, First Step Act Annual Report 17-18 (Apr. 2023). The Admissions and Orientation packet addendum distributed at Bureau institutions in November 2023 answered the question directly: "Q: Do I earn FTCs while in a halfway house and/or home confinement? A: Yes. As long as you continue to successfully program. . . . If your PATTERN Risk Level increases to Medium or High Risk for any reason, you will no longer be eligible to apply your FTCs, and may be removed from pre-release placement and returned to the institution." And in May 2025, the Director instructed unit teams to "use FSA and SCA Conditional Placement Dates--based on projected Earned Time Credits (FTCs) expected to earn--to guide prerelease planning and ensure accurate and timely referrals."

V. STATEMENT OF FACTS

Mr. Hansmeier's term of imprisonment commenced in July 2019. He has earned First Step Act time credits without interruption every day since. He has maintained a minimum or low PATTERN risk level through every reassessment; he has participated in the Financial Responsibility Program by paying down his restitution judgment; he has maintained employment; and he has participated in evidence-based recidivism reduction programming and productive activities throughout. The Bureau has already applied the full 365 days of credit available under Sec. 3624(g)(3) toward early transfer to supervised release. His FSA Projected Release Date is in July 2030. Those credits, and that date, are not at issue. What is at issue is the remainder of his credits, which by statute "shall be applied toward time in prerelease custody." 18 U.S.C. Sec. 3632(d)(4)(C). The Bureau has completed its individualized, five-factor review of Mr. Hansmeier under 18 U.S.C. Sec. 3621(b) and determined that he is appropriate for community placement, and it has transferred him from FCI Sandstone to the minimum-security Federal Prison Camp in Duluth, Minnesota, where he is now confined..

In September 2024, the Bureau produced an official First Step Act Time Credit Assessment for Mr. Hansmeier. (Pet. Ex. A.) It reported 1,585 FSA Conditional Placement Days and an FSA Conditional Placement Date of February 6, 2026. That figure was generated by the methodology described in Part IV.C: it projected Mr. Hansmeier's credit accrual, at his established earning rate, through the end of his term of imprisonment, counting the credits he would continue to earn while serving his sentence in prerelease custody.

[redacted]

TRULINCS 20953041 - HANSMEIER, PAUL R - Unit: DTH-E-A

FROM: [redacted]
TO: 20953041
SUBJECT: [redacted]
DATE: [redacted]

[redacted]

In December 2024, the Bureau produced a revised Assessment. (Pet. Ex. B.) It reported 1,074 FSA Conditional Placement Days and an FSA Conditional Placement Date of July 18, 2027. The revised figure projects Mr. Hansmeier's credit accrual only until the date of his transfer to prerelease custody and assigns no value to the credits he will earn thereafter. The entire 511-day reduction, and the entire seventeen-month delay, is attributable to that single change in methodology. On information and belief, the underlying change was implemented nationally in or about October 2024 through a memorandum from the Bureau's Correctional Programs Division titled "First Step Act (FSA) Planning Dates"; the December 2024 Assessment is the first document in Mr. Hansmeier's possession reflecting the change. The change was not published in the Federal Register, was not subjected to notice and comment, and was not accompanied by any acknowledgment that it departed from the methodology described in the November 2022 news release, the 2023 Annual Report to Congress, or the November 2023 Admissions and Orientation addendum. In litigation, the Bureau has characterized its prior methodology as a "coding error." See Declaration of Unit Manager Jade Beyer, Hoffman v. Warden, FCI Sandstone (D. Minn.).

Mr. Hansmeier did not change. His earning status, his risk level, his programming, and his conduct are what they were in September 2024. He intends, after transfer, to continue paying restitution through the Financial Responsibility Program, to maintain employment, to participate in recidivism reduction programming and productive activities, and to maintain a minimum or low risk level, exactly as he has done since July 2019. It is not speculative that he will remain in earning status in prerelease custody; it is the only pattern his seven-year record has ever shown.

February 6, 2026 has passed. Mr. Hansmeier remains in institutional custody at FPC Duluth. Each day there is a day the statute, the regulation, and the Bureau's own published construction required him to spend in the community. The harm is concrete: he is separated from his wife and minor children and from his parents and brothers in a manner prerelease custody would not require; he is forgoing employment income of approximately $100,000 per month available to him in prerelease custody, income that would be applied in substantial part to his restitution obligation; and he ordered his programming, his release planning, his family's arrangements, and his financial decisions around the February 6, 2026 date the Bureau gave him. None of that time can be restored after the fact.

VI. GROUNDS FOR RELIEF

Mr. Hansmeier is "in custody in violation of the Constitution or laws . . . of the United States," 28 U.S.C. Sec. 2241(c)(3), on four independent grounds. Each alone warrants the writ.

A. Ground One: The First Step Act requires the Bureau to count the credits Mr. Hansmeier will earn in prerelease custody when it determines whether he "has earned" credits equal to the remainder of his sentence.

The question is one of statutory interpretation, and this Court decides it without deference to the Bureau. "Courts must exercise their independent judgment in deciding whether an agency has acted within its statutory authority," and "may not defer to an agency interpretation of the law simply because a statute is ambiguous.." Loper Bright Enterprises v. Raimondo, 603 U.S. 369, 412-13, 144 S. Ct. 2244, 2273 (2024). "Agencies have no special competence in resolving statutory ambiguities. Courts do." Id., 144 S. Ct. at 2266. The best reading of the Act is the one the Bureau applied through September 2024.

Begin with the earning provision. Section 3632(d)(4)(A) says that a prisoner who successfully completes programming "shall earn time credits." Congress attached two temporal exclusions to that command in the very next subparagraph, for programming completed before enactment and for programming completed "during official detention prior to the date that the prisoner's sentence commences," Sec. 3632(d)(4)(B), and it attached offense-based and immigration-based exclusions in subparagraphs (D) and (E). The Supreme Court "do[es] not lightly assume that Congress has omitted from its adopted text requirements that it nonetheless intends to apply, and [its] reluctance is even greater when Congress has shown elsewhere in the same statute that it knows how to make such a requirement manifest." Jama v. ICE, 543 U.S.. 335, 341 (2005). Congress knew how to exclude periods of a sentence from credit-earning. It excluded two. Prerelease custody is not among them, and a prisoner in an RRC or on home confinement is indisputably "a person in the custody of the Bureau of Prisons," 18 U.S.C. Sec. 3635(4). The Bureau itself, after notice and comment, "agree[d]" that such prisoners "are eligible to earn FSA Time Credits under 18 U.S.C. 3632(d)(4)(A)." 87 Fed. Reg. at 2712-13. That premise is therefore settled: Mr. Hansmeier will earn credits in prerelease custody.

---

Next, the application provision. Those credits "shall be applied toward time in prerelease custody or supervised release." 18 U.S.C. Sec. 3632(d)(4)(C). The Ninth Circuit has carefully parsed that sentence and concluded that "toward" means "for the partial payment of," so that "earned time credits are an amount placed at a prisoner's disposal--a store of value (measured in days)" that must be "put to use" against "time in prerelease custody" or "time in supervised release." Gonzalez v. Herrera, 151 F.4th 1076, 1083-84 (9th Cir. 2025); accord Valladares v. Ray, 130 F.4th 74, 79 (4th Cir. 2025) ("the time credits can be applied toward earlier placement in pre-release custody or supervised release"). The verb is "shall." A credit that is earned but can never be applied is a statutory impossibility; as Gonzalez put it in rejecting the government's contention that surplus credits "are worth nothing," the statute does not permit a prisoner's earned credits to be "wasted." 151 F.4th at 1080. For a prisoner like Mr. Hansmeier, who has already applied the maximum twelve months toward supervised release under Sec. 3624(g)(3), the only place a credit earned in prerelease custody can be applied is "toward time in prerelease custody." And the only way to apply a credit toward time in prerelease custody is to let it pay for a day of that custody, which is to say, to count it in fixing the date on which prerelease custody begins. The September 2024 methodology did exactly that. The December 2024 methodology makes every credit Mr. Hansmeier earns after transfer worthless, in direct defiance of the word "shall."

Now the eligibility provision, which is where the Bureau will make its stand. Section 3624(g)(1)(A) asks whether the prisoner "has earned time credits . . . in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment." The Bureau does not, and cannot, read that clause as a static snapshot of credits in hand, because if it did, no prisoner could ever be transferred a day before his credits-to-date equaled his remaining sentence, and the Bureau's own Program Statement would be unlawful for directing staff to "assume that the inmate will remain in earning status" and to count "assumed FTC days that the inmate will earn." The Bureau's December 2024 methodology projects, too: it counts every credit Mr. Hansmeier will earn between today and July 18, 2027. Both parties therefore agree that Sec. 3624(g)(1)(A) is applied by projecting a prisoner's earning trajectory forward. The dispute is only whether the projection may be truncated at the institution's door.

Text, structure, and purpose all say it may not. Congress framed the eligibility test in the present perfect, "has earned," a tense that describes a condition existing in the present as the product of a process that began in the past and continues. When Congress meant to fix a credit calculation at a discrete historical moment, it used the simple past and said so explicitly: a disciplinary forfeiture "shall be limited to time credits that a prisoner earned as of the date of the prisoner's rule violation, and shall not include any future time credits that the prisoner may earn." 18 U.S.C. Sec. 3632(e)(2). That provision proves two things. It proves that Congress understood the difference between credits "earned as of" a date and credits a prisoner "may earn" in the future. And it proves that when Congress wanted to exclude "future time credits" from a calculation, it wrote the exclusion into the statute. Section 3624(g)(1)(A) contains no "as of the date" limitation and no exclusion of future credits. "Where Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." Russello v. United States, 464 U.S. 16, 23 (1983) (internal quotation marks omitted).

Structure confirms the reading. Section 3624(g)(1)(C) requires that the prisoner have "had the remainder of the prisoner's imposed term of imprisonment computed under applicable law." The "remainder" is itself a projection: it is the number of days that will elapse between now and release after good conduct time and other adjustments are applied. Section 3624(g)(1)(A) then compares that forward-looking figure to the prisoner's credits. Comparing a projected remainder to a projected accrual is coherent; comparing a projected remainder to a snapshot is not, and comparing it to a projection arbitrarily stopped at the moment of transfer, when the same statute and the same regulation say the accrual continues, is neither. Section 3624(g)(10) points the same way: Congress lifted the twelve-month and six-month ceilings on RRC and home-confinement placement specifically for prisoners transferred on the strength of time credits, contemplating prerelease terms long enough that continued earning during those terms would matter. And Sec. 3624(g)(11) obligates the Director to "ensure there is sufficient prerelease custody capacity to accommodate all eligible prisoners," a command that presupposes eligibility is fixed by the statute's arithmetic, not by the Bureau's convenience.

Purpose seals it. The time-credit system exists to create "incentives and rewards for prisoners to participate in and complete evidence-based recidivism reduction programs," 18 U.S.C. Sec. 3632(d), and a construction under which credits "lose their worth as an incentive" is disfavored. Gonzalez, 151 F.4th at 1088. The Ninth Circuit specifically observed that "a prisoner can participate in programming when on prerelease custody," citing the Bureau's final rule, and that "if earned time credits could reduce time in imprisonment, in prerelease custody, or in supervised release, their incentive value is maximized. That is the interpretation that best serves the purposes of the statute." Id. (citing 87 Fed. Reg. at 2712). The Bureau's December 2024 methodology tells a prisoner on home confinement that his continued programming, employment, and restitution payments earn him nothing. That is not the statute Congress wrote.

[redacted]

---

FROM: [redacted]
TO: 20953041
SUBJECT: [redacted]
DATE: [redacted]

[redacted]

Finally, even if the text left room for doubt, the Bureau's own contemporaneous and consistent construction would resolve it. Loper Bright did not strip agency interpretations of all weight; it restored the rule that an agency's interpretation earns respect according to "the thoroughness evident in its consideration, the validity of its reasoning, its consistency with earlier and later pronouncements, and all those factors which give it power to persuade," Skidmore v. Swift & Co., 323 U.S. 134, 140 (1944), and the Court emphasized that interpretations "issued contemporaneously with the statute at issue, and . . . remained consistent over time, may be especially useful." Loper Bright, 603 U.S. at 386, 144 S. Ct. at 2258. The Bureau's construction that credits continue to accrue in prerelease custody and are counted "for the full incarceration term" was adopted after notice and comment, announced publicly, reported to Congress, printed in orientation materials, and embedded in the agency's national computation system for nearly three years. The December 2024 reversal, by contrast, was never explained at all. A "convenient litigating position" or "post hoc rationalization" receives no weight. Kisor v. Wilkie, 588 U.S. 558, 579 (2019).

B. Ground Two: The Bureau's notice-and-comment regulation and its authoritative construction of that regulation bind the agency.

An agency must follow its own regulations. United States ex rel. Accardi v. Shaughnessy, 347 U.S. 260, 267-68 (1954); Morton v. Ruiz, 415 U.S. 199, 235 (1974) ("Where the rights of individuals are affected, it is incumbent upon agencies to follow their own procedures."). The final rule at 28 C.F.R. Part 523, Subpart E, was adopted through notice and comment after the Bureau expressly considered, and expressly rejected, a prohibition on earning credits in prerelease custody. The agency's published explanation of its own rule--that RRC and home-confinement inmates "are eligible to earn FSA Time Credits under 18 U.S.C. 3632(d)(4)(A)"--is the authoritative construction of the regulation, issued by the agency itself, with the formality of Federal Register publication, as part of the rulemaking record. 87 Fed. Reg. at 2712-13. Program Statement 5410.01 implemented that construction by directing monthly reassessments "for inmates in pre-release placement" that "capture changes which occur during prerelease placement," and by projecting credits "until the FSA conditional release date." The Attorney General told Congress the Bureau would "calculate and award time credits for the full incarceration term." First Step Act Annual Report at 17 -18.

A rule that permits earning in prerelease custody, combined with a statutory command that earned credits "shall be applied," necessarily requires the Bureau to count those credits in its eligibility calculation. The December 2024 methodology honors the rule in name and nullifies it in operation. That is an Accardi violation. And the Bureau cannot escape it by labeling the governing methodology a "planning tool" or by reciting that dates "are subject to change," because those disclaimers speak to changes in the prisoner's "behavior, program participation, [and] eligibility," not to the agency's unilateral rewriting of the formula. An agency may not "avoid application of Accardi by simply disclaiming any binding effect" of rules whose function is to confer a benefit on the individuals they govern. See Damus v. Nielsen, 313 F. Supp. 3d 317, 337-38 (D.D.C. 2018).

C. Ground Three: The December 2024 reversal was adopted without the procedures or the reasoned explanation the law requires.

Whether one calls it a policy change or an error correction, the Bureau's revised methodology, first reflected in Mr. Hansmeier's December 2024 Assessment, amended the operative rule governing how First Step Act credits are counted, and it did so without any of the process that governs such an amendment. The APA defines "rule making" to include "amending, or repealing a rule," 5 U.S.C. Sec. 551(5), and "agencies must use the same procedures when they amend or repeal a rule as they used to issue the rule in the first instance." Perez v. Mortgage Bankers Ass'n, 575 U.S. 92, 101 (2015). The rule that prisoners in prerelease custody earn credits was promulgated through notice and comment. 87 Fed. Reg. 2705. A methodology that renders those credits uncountable, and therefore unearnable in any meaningful sense, repeals that rule sub silentio. It could be adopted, if at all, only through notice and comment under 5 U.S.C. Sec. 553.

Independently, "[a]n agency may not . . . depart from a prior policy sub silentio or simply disregard rules that are still on the books," and it "must at least display awareness that it is changing position." FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009). Where "longstanding policies may have engendered serious reliance interests," the agency must provide "a reasoned explanation . . . for disregarding facts and circumstances that underlay or were engendered by the prior policy." Encino Motorcars, LLC v. Navarro, 579 U.S. 211, 221-22 (2016) (internal quotation marks omitted). The agency must "assess the existence and strength of any reliance interests, determine whether they were significant, and weigh any such interests

against competing policy concerns"; a failure to do so "was arbitrary and capricious." Department of Homeland Security v. Regents of the University of California, 591 U.S. 1, 33 (2020). And "a court may uphold agency action only on the grounds that the agency invoked when it took the action," not on "post hoc rationalization." Id. at 20-21. Judged by these standards, the December 2024 reversal fails at every step. The Bureau did not acknowledge that it was changing position; it denied that it had one to change. It did not explain why the statute, the final rule, or the rulemaking record compelled a different result; it said nothing about them. It did not identify, let alone weigh, the reliance interests of the thousands of prisoners who, like Mr. Hansmeier, had been told in writing that they would keep earning in the community and had been given a date. And its only proffered justification, a "coding error," is a litigating label that appears nowhere in the agency's contemporaneous decisional documents. An unexplained about-face of this kind is "arbitrary, capricious, [and] an abuse of discretion." 5 U.S.C. Sec. 706(2)(A); Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co., 463 U.S. 29, 43 (1983).

These principles do not depend on the availability of a freestanding APA cause of action. Section 2241 authorizes the writ whenever custody violates "the laws . . . of the United States," and the Bureau's failure to comply with Sec. 553 and Sec. 706 in adopting the methodology under which Mr. Hansmeier is held is a violation of those laws. The Eighth Circuit has, in habeas, held Bureau rules governing community placement invalid because they conflicted with the governing statute, Fults, 442 F.3d at 1090-92; Elwood, 386 F.3d at 846-47, and a rule adopted in violation of the APA's procedural commands is no less "not in accordance with law," 5 U.S.C. Sec. 706(2)(A), (D).

D. Ground Four: Applying the December 2024 methodology to Mr. Hansmeier violates the Ex Post Facto Clause and the fair-notice guarantee of the Due Process Clause.

The Ex Post Facto Clause, U.S.. Const. art. I, Sec. 9, cl. 3, forbids any law that "changes the punishment, and inflicts a greater punishment, than the law annexed to the crime, when committed." Weaver v. Graham, 450 U.S. 24, 28 (1981). A law is ex post facto if "it must apply to events occurring before its enactment, and it must disadvantage the offender affected by it." Id. at 29. "Even if a statute merely alters penal provisions accorded by the grace of the legislature, it violates the Clause if it is both retrospective and more onerous than the law in effect on the date of the offense." Id. at 30-31. The Clause reaches changes to the rules governing release credits, because "a prisoner's eligibility for reduced imprisonment is a significant factor entering into both the defendant's decision to plea bargain and the judge's calculation of the sentence to be imposed," id. at 32, and it reaches administrative action: in Lynce v. Mathis, 519 U.S. 433 (1997), the Court unanimously held that the retroactive cancellation of provisional release credits by a state corrections department violated the Clause, id. at 446-47, and in Garner v. Jones, 529 U.S. 244 (2000), the Court applied the Clause to a parole board's rule, holding that "the presence of discretion does not displace the protections of the Ex Post Facto Clause," id. at 253, and that the "controlling inquiry" is whether the retroactive change "created a significant risk of increasing the measure of punishment," id. at 250. See also Peugh v. United States, 569 U.S. 530, 533 (2013).

The December 2024 methodology is retrospective and disadvantageous. It reaches back to credits Mr. Hansmeier had already earned and to a Conditional Placement Date the Bureau had already computed and communicated under the rules then in force, and it lengthens by 511 days the period he must spend in secure custody. That is not a "speculative and attenuated possibility" of harm, California Department of Corrections v. Morales, 514 U.S. 499, 509 (1995); it is a certain, quantified, day-for-day increase in the severity of confinement, imposed by an administrative body's revision of the formula governing his release from the institution. Lynce forecloses any argument that a change effected through the corrections system's own procedures rather than by statute is beyond the Clause, 519 U.S. at 445-47, and Garner forecloses any argument that the Bureau's placement discretion cleanses the violation, 529 U.S. at 253.

Even if the Court were to conclude that an unpublished computational directive is not a "law" for Ex Post Facto purposes, the Due Process Clause independently forbids the retroactive application of an "unexpected and indefensible" reinterpretation of the rules governing punishment. Rogers v. Tennessee, 532 U.S. 451, 462 (2001) (quoting Bouie v. City of Columbia, 378 U.S. 347, 354 (1964)). The principle applies with full force to agencies: an interpretation that would impose obligations, or strip benefits, "without fair warning" and that "conflict[s] with a position the agency has previously taken" works an "unfair surprise" that due process does not tolerate. Christopher v. SmithKline Beecham Corp., 567 U.S. 142, 155-56 (2012); see Kisor, 588 U.S. at 579 (same). The Bureau told Mr. Hansmeier in its published policy, in its report to Congress, in its orientation materials, and in his own official assessment that his credits would continue to accrue in the community and that his transfer date was February 6, 2026. He structured seven years of institutional conduct and his family's life around that representation. Silently reversing it, and then denying that any reversal occurred, is the definition of unfair surprise.

VII. THE GOVERNMENT'S ANTICIPATED DEFENSES, AND WHY EACH FAILS

Mr. Hansmeier anticipates that the government will raise eight defenses. He addresses each so that the Court may resolve this petition on a complete record.

TRULINCS 20953041 - HANSMEIER, PAUL R - Unit: DTH-E-A

FROM: [redacted]
TO: 20953041
SUBJECT: [redacted]
DATE: [redacted]

[redacted]

A. "A request for transfer to prerelease custody is a conditions-of-confinement claim not cognizable in habeas under Kruger and Spencer."

The government will cite Kruger v. Erickson, 77 F.3d 1071, 1073 (8th Cir. 1996) (per curiam), and Spencer v. Haynes, 774 F.3d 467, 469-70 (8th Cir. 2014), for the proposition that habeas lies only where success would shorten the prisoner's time in Bureau custody, and it will note that a prisoner in an RRC or on home confinement remains in Bureau custody. The argument fails for three reasons.

First, this is a credit-computation case. Kruger involved a demand for a DNA test; Spencer involved a demand for a compassionate-release motion. Neither concerned the Bureau's arithmetic in computing a prisoner's sentence credits, which the Eighth Circuit has squarely held is a challenge to "the execution of [the] sentence" cognizable under Sec. 2241. Matheny, 307 F.3d at 711-12. The Supreme Court decided Barber v. Thomas, a dispute over the Bureau's method of computing good conduct time, on a Sec. 2241 petition, 560 U.S. at 478-79, and the First Circuit recently vacated the dismissal of a Sec. 2241 petition challenging the Bureau's refusal to award First Step Act credits for a period of custody, holding the claim was properly brought in habeas. Miles v. Bowers, --- F.4th --- (1st Cir. Apr. 27, 2026). Nothing in Kruger or Spencer suggests that a sentence-credit claim becomes non-cognizable because the credits, once counted, move the prisoner out of an institution rather than out of custody altogether.

Second, the premise that transfer to prerelease custody is not "release" is contrary to the Supreme Court's understanding of the writ. Habeas "is the traditional means" for challenging "the very fact or duration of . . . physical imprisonment," and it is available whenever the prisoner "seeks a determination that he is entitled to immediate release or a speedier release from that imprisonment." Preiser, 411 U.S. at 484, 500. Home confinement is not "physical imprisonment" in any ordinary sense of the term, and a prisoner in an RRC who works in the community, sees his family, and returns at night to a contract facility is not imprisoned in the sense the Great Writ addresses. The Supreme Court has long treated a change in the level or place of custody as within the writ's reach, see, e.g., Hensley v. Municipal Court, 411 U.S. 345, 351-53 (1973) (release on personal recognizance is "custody" cognizable in habeas), and has recently reaffirmed that a challenge to the legality of one's confinement is a "core" habeas claim that must be brought in habeas in the district of confinement, Trump v. J.G.G., 604 U.S. 670, 671-72 (2025) (per curiam).

Third, the government has abandoned this position. In Maxwell v. Thomas, No. 25-5930, the Solicitor General declined to defend the Fifth Circuit's holding that a First Step Act credit claim seeking transfer to a halfway house or home confinement cannot be brought under Sec. 2241, and the Supreme Court appointed an amicus to argue the point the United States would not. Consistent with that position, the government has represented to the Eighth Circuit that it no longer contests Sec. 2241 jurisdiction over First Step Act transfer claims. See Fed. R. App. P. 28(j) Letter, Osorio-Calderon v. Warden, FCI Sandstone, No. 25-3090 (8th Cir. May 13, 2026). The Eighth Circuit itself, in Fortner, 170 F.4th at 657-58, acknowledged the circuit split on the question and declined to resolve it. The Court should not dismiss on a ground the government itself has disclaimed while the Supreme Court is deciding it. And in all events, "[i]t is a well-settled rule that there is a strong presumption that Congress intends judicial review of administrative action," Bowen v. Michigan Academy of Family Physicians, 476 U.S. 667, 670 (1986), and a construction of the habeas statute that would "deny any judicial forum for a colorable constitutional claim" would raise "serious constitutional question[s]," Webster v. Doe, 486 U.S. 592, 603 (1988).

B. "Under Osorio-Calderon, Sec. 3621(b) makes the Bureau's placement decisions unreviewable, and the First Step Act does not set a date by which transfer must occur."

The government will rely heavily on Osorio-Calderon v. Warden, FCI Sandstone, No. 25-3090 (8th Cir. June 30, 2026), which affirmed the dismissal of a Sec. 2241 petition seeking to compel transfer to prerelease custody. The court held that Sec. 3621 (b)'s provision that "a designation of a place of imprisonment under this subsection is not reviewable by any court" barred review of the Bureau's individualized decision not to place the petitioner in a Puerto Rico halfway house, and that Sec. 3632(d) (4)(C) "is best read as a directive that identifies what group of prisoners the BOP must transfer into prerelease custody, not as establishing an immutable date by which the BOP must effectuate individual transfers." Slip op. at 8 (quoting Crowe v.. Federal Bureau of Prisons, 2025 WL 1635392, at *22 (D.D.C. June 9, 2025)). Mr. Hansmeier takes Osorio-Calderon as he finds it. It does not control this case, for three reasons.

First, Osorio-Calderon involved no dispute about eligibility. The Eighth Circuit was explicit: "There is no dispute that Osorio-Calderon satisfies the criteria of Sec. 3624(g)(1)." Slip op. at 4 n.5. The petitioner there had 730 days of credit already applied toward prerelease custody and an undisputed eligibility date of July 3, 2024; what he challenged was the Bureau's subsequent, individualized, five-factor determination under Sec. 3621(b) that no suitable placement existed. This petition presents the antecedent question that Osorio-Calderon expressly did not: whether Mr. Hansmeier is in "the group of prisoners the BOP must transfer" at all, and when he entered it. That question is answered by counting credits under Sec. 3632(d)(4), a provision of Subchapter D, not by designating a place of imprisonment under Sec. 3621(b), a provision of Subchapter C. And unlike in Osorio-Calderon, the Bureau's individualized judgment here is not adverse: the Bureau has completed its five-factor review of Mr. Hansmeier under Sec. 3621(b) and determined that he is appropriate for community placement. The only thing standing between Mr. Hansmeier and prerelease custody is the Bureau's count. Section 3621(b)'s preclusion clause is, by its terms, confined to "a designation of a place of imprisonment under this subsection." A statute precluding review must be read narrowly and with "a strong presumption favoring judicial review," Guerrero-Lasprilla v. Barr, 589 U.S. 221, 229 (2020) (internal quotation marks omitted), and the Eighth Circuit has held, in the closely analogous setting of Sec. 3625, that a bar on review of individualized Bureau "determination[s]" does not immunize the Bureau's interpretation of the governing statute from judicial review. Martin v. Gerlinski, 133 F.3d 1076, 1079 (8th Cir. 1998). The Eighth Circuit's own precedents draw exactly this line: Elwood and Fults reviewed, and invalidated, categorical Bureau rules governing eligibility for community placement, while leaving individualized designations to the agency. Osorio-Calderon cited both cases with approval. Slip op. at 7.

Second, the relief Mr. Hansmeier seeks respects the line Osorio-Calderon drew. He asks the Court to declare the lawful method of computing his credits, to order the Bureau to recompute his FSA Conditional Placement Days and Conditional Placement Date accordingly, and to order the Bureau to process him for transfer to prerelease custody in accordance with Sec.. 3624(g) as an eligible prisoner. Whether that custody takes the form of a residential reentry center or home confinement, and which facility, are for the Bureau. And here the Bureau's placement discretion has already been exercised, in Mr. Hansmeier's favor: its five-factor review determined that he is appropriate for community placement, and it has moved him to a minimum-security camp in anticipation of that placement. What stands between Mr. Hansmeier and prerelease custody is not any designation judgment but the national computational policy under which he purportedly does not yet qualify. Section 3621(b) does not make the Bureau's legal errors unreviewable by relabeling them designations.

Third, Osorio-Calderon's observation that Sec. 3632(d)(4)(C) does not fix "an immutable date" addressed the timing of an individual transfer after eligibility is established and a placement must be found. It did not hold, and could not consistently with Sec. 3624(g)(1)(A) hold, that the date on which a prisoner becomes eligible is itself unreviewable. Eligibility is a function of arithmetic that Congress prescribed. If the Bureau could insulate that arithmetic from review by calling its output a "placement decision," then Matheny, Barber, and the entire body of law permitting habeas review of sentence-credit computations would be a dead letter for the largest credit program in the federal system. Nothing in Osorio-Calderon suggests the Eighth Circuit intended that result, and its careful reservation of the eligibility question in footnote 5 suggests the opposite.

C. "Section 3624(g)(1)(A) requires that the prisoner actually 'has earned' credits equal to the remainder; credits not yet earned cannot be counted; and credits earned in prerelease custody have nowhere to go because they can be applied only toward supervised release, which is capped at twelve months."

This is the government's principal merits argument, and it collapses on inspection. The Bureau cannot argue that unearned credits may never be counted, because the Bureau counts them. Its Program Statement directs staff to "assume that the inmate will remain in earning status" and to add "assumed FTC days that the inmate will earn"; its May 2025 directive requires unit teams to use Conditional Placement Dates "based on projected Earned Time Credits (FTCs) expected to earn"; and its December 2024 Assessment of Mr. Hansmeier counts every credit he will earn between now and July 18, 2027. The government's position is therefore not that projection is forbidden. It is that projection must stop at the moment of transfer. That position finds no support in the text. The word "remainder" in Sec. 3624(g)(1)(A) means the remainder of the "imposed term of imprisonment," which continues through the last day of prerelease custody; the credits "earned" under Sec.. 3632(d)(4)(A) continue to accrue through that same day, as the Bureau's own rule concedes; and the present-perfect "has earned," set against Sec. 3632(e)(2)'s explicit exclusion of "future time credits" from forfeiture calculations, confirms that Congress did not freeze the eligibility calculation at any historical moment..

[redacted]

---

FROM: [redacted]
TO: 20953041
SUBJECT: [redacted]
DATE: [redacted]

[redacted]

The government's fallback, that credits earned in prerelease custody may be applied only "toward transfer to supervised release," rests on a single tentative word in the 2022 preamble: the Bureau said such credits could "presumably" be so applied. 87 Fed. Reg. at 2713. A presumption in a preamble is not a limitation in a rule, and it cannot override the statute's command that credits "shall be applied toward time in prerelease custody or supervised release." 18 U.S.C. Sec. 3632(d)(4)(C) (emphasis added). Congress used the disjunctive. For a prisoner who, like Mr. Hansmeier, has already received the maximum twelve months toward supervised release, the government's reading means that every credit he earns after transfer is void. The Ninth Circuit rejected precisely that argument in Gonzalez, refusing to hold that surplus credits "are worth nothing" and that the prisoner's effort in earning them "is wasted," 151 F.4th at 1080, and describing a statutory scheme in which the Bureau transfers the prisoner into prerelease custody, "cashing in earned time credits to do so," and then continues "spending earned time credits to end prerelease custody early," id. at 1087. The Second and Sixth Circuits have disagreed with Gonzalez on whether credits may shorten a term of supervised release, Rivera-Perez v. Stover, No. 25-149 (2d Cir. Mar. 26, 2026); Hargrove v. Healy, 155 F.4th 530 (6th Cir. 2025), but that disagreement only strengthens Mr. Hansmeier's position: if credits cannot be applied to supervised release beyond the twelve-month cap, then the only application left for credits earned in prerelease custody is "toward time in prerelease custody," which is exactly what the September 2024 methodology did. The government cannot simultaneously maintain that prerelease-custody credits are earnable, that they may not be applied to prerelease custody, and that they may not be applied to supervised release. One of those propositions must yield, and the one with no basis in the statute is the second.

Finally, the government may say that the September 2024 methodology is "circular," because it transfers a prisoner before his credits-in-hand equal his remaining sentence on the expectation that he will keep earning. That is not circularity; it is a conditional placement, which is why the Bureau calls it a Conditional Placement Date. The Bureau's own orientation materials explain the condition: a prisoner in prerelease custody keeps earning "as long as you continue to successfully program," and if his risk level rises "for any reason, you will no longer be eligible to apply your FTCs, and may be removed from pre-release placement and returned to the institution." Program Statement 5410.01 provides for monthly reassessment of prerelease inmates to "capture changes which occur during prerelease placement." The system Congress designed and the Bureau built already accounts for the contingency. A prisoner who stops earning is recalculated and, if necessary, returned. That safeguard is the answer to the government's concern, and it is the reason the projection can and must run through the end of the term.

D. "The September 2024 date was a non-binding planning tool generated by a coding error; the Bureau is free to correct its mistakes; and Frierson v. Rardin so held."

The government will cite Frierson v. Rardin, No. 2:24-cv-12456 (E.D. Mich. Feb. 5, 2025), in which a court accepted a Bureau declaration that the September 2024 "Planning" section of the FTC Worksheet was "creating errors," and held that the Bureau "was not bound to honor the original conditional placement date." Frierson does not help the government here. The petitioner in Frierson argued only that the Bureau was estopped by the earlier worksheet; the court analyzed the claim as one of liberty interest and entitlement, and it never addressed the text of Sec. 3632(d)(4)(B) or Sec. 3632(e)(2), the rulemaking history at 87 Fed. Reg. 2712-13, the Bureau's November 2022 announcement, the 2023 Annual Report to Congress, or Program Statement 5410.01's projection "until the FSA conditional release date." Mr. Hansmeier's primary claim is not that the Bureau is bound by a worksheet. It is that the statute and the regulation require the September 2024 methodology, so that the "error" lies in the reversal, not in the September 2024 methodology. Which method is correct is a question of law for this Court, and the Bureau's characterization of its own prior practice as an "error" is entitled to no weight in answering it. Loper Bright, 603 U.S. at 412-13.

The "coding error" label also fails on its own terms. The methodology reflected in the September 2024 Assessment was not a stray line of code. It implemented what the Bureau announced in November 2022 ("inmates will be able to continue earning credit while in the community"), what the Attorney General reported to Congress in April 2023 (credits are calculated "with a presumption that the time credits will accrue throughout the term of incarceration"), and what the Bureau printed in its November 2023 orientation materials ("Q: Do I earn FTCs while in a halfway house and/or home confinement? A: Yes."). A policy stated in an agency news release, a report to Congress, and institution-wide orientation materials is a policy, and when the agency abandons it the agency must say so and say why. Fox, 556 U.S. at 515. The "coding error" narrative is, at bottom, a "post hoc rationalization" advanced in litigation, Regents, 591 U.S. at 20-21, offered through declarations of institution-level staff who neither made the national decision nor can explain it. The disclaimers on the worksheet that dates "may change based on AIC behavior, programming participation, or changes in eligibility" confirm rather than refute the point: they reserve the Bureau's

power to recalculate when the prisoner's circumstances change, not to rewrite the formula when the prisoner's circumstances have not.

E. "Prisoners have no liberty interest in earning or applying First Step Act credits, as this District held in Fiorito v. Fikes and Gant v. King."

The government will cite Fiorito v. Fikes, 2022 WL 16699472, at *6 (D. Minn. Nov. 3, 2022), and Gant v. King, 2023 WL 6910771, at *3 (D. Minn. Oct. 19, 2023), for the proposition that First Step Act credits "are not a general entitlement" and that the "opportunity" to earn them creates no protected liberty interest. Those decisions answer a question Mr. Hansmeier does not ask. He does not assert a procedural due process claim to notice and a hearing before the loss of an opportunity to program. He asserts that the Bureau is miscounting credits he has earned and will earn under a statute that says he "shall earn" them and that they "shall be applied." A statutory claim to the correct computation of sentence credits does not require a constitutional liberty interest; it requires a statute, and this one is written in mandatory terms. Matheny, Barber, and Elwood did not ask whether the petitioners had a liberty interest in the credits or placements at issue. They asked whether the Bureau had read the law correctly. Nor does the Ex Post Facto Clause depend on a liberty interest: it applies "[e]ven if a statute merely alters penal provisions accorded by the grace of the legislature." Weaver, 450 U.S. at 30-31. And the "contingency" that Fiorito found fatal to a liberty interest, that programming opportunities may be interrupted by events outside the prisoner's control, is beside the point here, because the Bureau's own projection methodology already assumes uninterrupted earning; the only contingency the Bureau refuses to assume is the one its own rule guarantees.

F. "The Ex Post Facto Clause applies to laws, not to an agency's correction of an erroneous interpretation of an unchanged statute."

The government will argue that no "law" changed in late 2024, that the Bureau merely corrected its reading of a statute that has been on the books since 2018, and that an interpretive correction cannot be ex post facto. Lynce answers the first half of the argument: the Clause reaches the retroactive cancellation of release credits accomplished through the corrections department's own administrative procedures, 519 U.S. at 445-47, and Garner reaches rules "governing release dates" adopted by an administrative body, 529 U.S. at 250. The final rule at 28 C.F.R. Part 523, Subpart E, is a legislative rule with the force of law, and the Bureau's national computation policy is the mechanism by which that law is executed against each prisoner. The second half of the argument assumes its conclusion. Whether the December 2024 methodology "corrected" an error or "changed" the law depends on which reading of the statute is right, and for the reasons in Ground One the September 2024 reading is right. If the Court agrees, then the December 2024 methodology is not a correction but a retroactive, unpublished, unexplained alteration of the rules governing Mr.. Hansmeier's release from the institution, and it is subject to the Clause. And even if the Court were to view the matter as a change in interpretation rather than in law, the Due Process Clause's fair-notice principle, which the Supreme Court has applied to agencies that reverse course without warning, Christopher, 567 U.S. at 155-56, forbids the retroactive application of that change to a prisoner who structured seven years of conduct in reliance on the agency's published position. Ground Four is pleaded in the alternative on precisely that basis.

G. "The APA does not apply: Sec. 2241 is not an APA action; 18 U.S.C. Sec. 3625 exempts Bureau determinations under Sec. 3624 from APA review; and Program Statements are internal guidance exempt from notice and comment under Reno v. Koray."

Each point misfires. Section 3625 provides that the APA's adjudication and judicial-review provisions "do not apply to the making of any determination, decision, or order under this subchapter," meaning Subchapter C of Chapter 229, Secs. 3621-3626. The calculation of how many credits a prisoner earns is made under Sec. 3632(d)(4), which Congress placed in Subchapter D. Section 3625 does not reach it. Even as to Sec. 3624(g), the Eighth Circuit has held that Sec. 3625 bars review of individualized determinations, not review of whether the Bureau's interpretation of the statute is lawful. Martin, 133 F.3d at 1079; accord Reeb v. Thomas, 636 F.3d 1224, 1227-28 (9th Cir. 2011). Mr. Hansmeier challenges the interpretation, not an individualized exercise of judgment.

Reno v. Koray, 515 U.S. 50, 61 (1995), held that a Program Statement is an internal guideline that may be adopted without notice and comment. That holding cuts against the government, not for it. If a Program Statement or an unpublished memorandum needs no notice and comment, it is because it cannot change the law; it can only interpret it. An internal memorandum therefore cannot narrow a legislative rule adopted through notice and comment, Perez, 575 U.S. at 101, and it cannot override the statute. The Bureau's "Planning Dates" memorandum purports to do both. To the extent it merely interprets, it is entitled to weight only insofar as it persuades, Christensen v. Harris County, 529 U.S. 576, 587 (2000), and an unexplained reversal of a three-year-old published position persuades no one. To the extent it amends the rule, it is procedurally void.

[redacted]

---

FROM: [redacted]
TO: 20953041
SUBJECT: [redacted]
DATE: [redacted]

[redacted]

As to the vehicle, Mr. Hansmeier does not need the APA's cause of action. The APA's requirements of notice-and-comment rulemaking and reasoned decisionmaking are "laws . . . of the United States" within Sec. 2241(c)(3), and the Eighth Circuit has applied them to Bureau rules in habeas. Fults, 442 F.3d at 1090-92 (holding a Bureau community-confinement regulation invalid as contrary to statute in a Sec. 2241 proceeding). If the Court concludes otherwise, Mr. Hansmeier requests leave to amend to add a claim under 5 U.S.C. Secs. 702 and 706 and 28 U.S.C. Sec. 1331. See Spencer, 774 F.3d at 471.

H. "The claim is unripe or speculative because Mr. Hansmeier has not yet earned the credits at issue; it may become moot; and he failed to exhaust."

The speculation objection proves too much. Every Conditional Placement Date the Bureau has ever issued rests on credits not yet earned. If reliance on projected credits made a claim unripe, the Bureau's own December 2024 Assessment, which projects Mr. Hansmeier's credits through July 18, 2027, would be unripe too. The contingency the government invokes is one the Bureau's own system is built to manage through monthly reassessment and, where warranted, return to the institution. And the injury here is not future; it is present. Since February 6, 2026, Mr. Hansmeier has been confined in an institution rather than in the community because of a computation he contends is unlawful. That is a live, concrete controversy today.

The mootness objection is a reason for speed, not for dismissal. The Eighth Circuit dismissed Fortner as moot because the Bureau transferred the petitioner while his appeal was pending, 170 F.4th at 658, and the Bureau's own current projections anticipate transferring Mr. Hansmeier to prerelease custody in January 2027. Mr. Hansmeier has therefore requested, at the outset of this Petition, expedited treatment under 28 U.S.C. Sec. 2243, which directs that the writ or an order to show cause issue "forthwith" and that the return be made within three days unless extended for good cause "not exceeding twenty days." If the Bureau transfers Mr. Hansmeier before judgment, the dispute over the correct number of his FSA Conditional Placement Days will remain live to the extent it affects the duration of any prerelease placement, and in any event the question is "capable of repetition, yet evading review" for a prisoner population whose transfer dates the Bureau controls.

Exhaustion is addressed in Part III. The government cannot simultaneously maintain that the December 2024 methodology is a binding national rule from which no Warden or Regional Director may depart and that Mr. Hansmeier was required to ask them to depart from it.

VIII. RELIEF REQUESTED

WHEREFORE, Mr. Hansmeier respectfully requests that the Court:

1. Order Respondent to show cause forthwith, pursuant to 28 U.S.C.. Sec. 2243, why the writ should not be granted, and expedite consideration of this Petition;

2. Declare that, under 18 U.S.C.. Secs. 3632(d)(4) and 3624(g)(1)(A) and 28 C.F.R. Part 523, Subpart E, First Step Act time credits that an eligible prisoner will earn while serving his sentence in prerelease custody must be counted in determining the date on which the prisoner "has earned time credits . . . in an amount that is equal to the remainder of the prisoner's imposed term of imprisonment";

3. Declare that the Bureau of Prisons' December 2024 methodology, which projects a prisoner's credits only through the date of transfer to prerelease custody, is contrary to law, was adopted without the procedures and reasoned explanation required by 5 U.S.C. Secs. 553 and 706, violates the Bureau's own regulations, and, as applied retroactively to Mr. Hansmeier, violates the Ex Post Facto and Due Process Clauses;

4. Order Respondent and the Bureau of Prisons to recompute Mr. Hansmeier's FSA Conditional Placement Days as 1,585 and his FSA Conditional Placement Date as February 6, 2026, or such other figures as result from projecting his credit accrual, at his established earning rate, through his FSA Projected Release Date;

5. Order Respondent and the Bureau of Prisons, within fourteen days, to process Mr. Hansmeier for transfer to prerelease custody as an eligible prisoner under 18 U.S.C. Sec. 3624(g), and to effectuate that transfer forthwith, and to continue to award

---

and count First Step Act time credits thereafter as provided in 18 U.S.C. Sec. 3632(d)(4) and 28 C.F.R. Sec. 523.42;

6. In the alternative, if the Court concludes that any portion of this Petition is not cognizable in habeas, recharacterize that portion as a civil action under 5 U.S.C. Secs. 702 and 706 and 28 U.S.C. Sec. 1331, or hold this Petition in abeyance pending the Supreme Court's decision in Maxwell v. Thomas, No. 25-5930, whichever the Court deems appropriate; and

7. Grant such other and further relief as law and justice require.

Respectfully submitted,

Dated: 8-30-26

Paul R. Hansmeier
Reg. No. 20953-041
Federal Prison Camp
P.O. Box 1000
Duluth, MN 55814
Petitioner, Pro Se

VERIFICATION

I, Paul R. Hansmeier, declare under penalty of perjury pursuant to 28 U.S.C. Sec. 1746 that I am the Petitioner in this action, that I have read the foregoing Petition, and that the factual allegations stated therein are true and correct to the best of my knowledge, information, and belief.

Executed on 8-30-26, at Duluth, Minnesota.

Paul R. Hansmeier

CERTIFICATE OF SERVICE

I certify that on ______________, I placed a copy of the foregoing Petition, with its exhibits, in the institutional legal mail system at FPC Duluth, first-class postage prepaid, addressed to the Clerk of Court, United States District Court for the District of Minnesota, and to the Office of the United States Attorney for the District of Minnesota, 600 U.S. Courthouse, 300 South Fourth Street, Minneapolis, MN 55415.

Paul R. Hansmeier

[redacted]